*Declined to File*
*J. Berman's*
*Chambers*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

    -v-        :

CHRISTOPHER COLON,        :

          Defendant.        :

                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 Cr. 12 (RMB)
11 Cr. 614 (VM)

RECEIVED
MAY 21 2012
CHAMBERS OF
RICHARD M. BERMAN
U.S.D.J.

## GOVERNMENT'S SENTENCING MEMORANDUM – DEFENDANT CHRISTOPHER COLON

The Government respectfully submits this memorandum in advance of the sentencing of defendant Christopher Colon, which is scheduled for June 4, 2012. Colon pled guilty pursuant to a plea agreement with the Government to charges covering two separate indictments, as captioned above. In that agreement, Colon and the Government stipulated that Colon's properly-calculated Guidelines range is 78 to 97 months. (A copy of the plea agreement is attached as Exhibit A). Given the extraordinary acts of violence committed by Colon on behalf of the Gambino Family, the Government seeks a sentence of 97 months' imprisonment, which is at the top of Colon's stipulated Guidelines range.[1]

### I.     Offense Conduct

Colon is the very definition of a mafia enforcer. Over the years, he has carried out an alarming string of vicious attacks, many of them targeted at innocent victims who were somehow perceived as posing a threat to Colon's reputation or standing as a Gambino Family

---

[1]     In the Pre-Sentence Report ("PSR"), the Probation Office calculates a higher Guidelines range of 87 to 108 months. The Government stands by its plea agreement, and the calculation set forth therein, even though that results in a lower Guidelines range for Colon.

tough guy.  Those assaults are described in detail below.

Assault of Joe Barretta, August 2008.  In August 2008, Joseph Barretta got into a fight with Colon at a nightclub in Queens.  During the fight, Barretta bested Colon, knocking Colon to the ground.  Colon's standing in the Gambino Family rested largely on his reputation as an enforcer; thus, for Colon to get knocked down in public was an embarrassment and a professional setback.  Colon therefore sought, and received, permission from his Captain, Alphonse Trucchio, to get revenge against Barretta.  Colon in turn reached out to Howard Santos – who would later cooperate with the Government – who agreed to help Colon with the attack. On August 4, 2008, Colon, Santos, and a third individual met before the planned attack.  Colon had a knife, and he gave a baton, or "blackjack," to Santos.  Colon, Santos, and the third individual then went to the office building in Queens where Barretta worked.  Colon, Santos, and the third individual walked into Barretta's office and attacked him.  During the assault, Colon used his knife to stab Barretta in the leg or hip area.  Barretta eventually managed to run out of his office and onto a public street, at which point the attack ended.  After the attack, Colon threw his knife into a sewer to dispose of evidence of the attack.

Assault of David Claudio, July 2009.  As confirmed by the guilty pleas of both Trucchio and Colon, the Gambino Family has for years exercised extortionate control over numerous strip clubs in Queens, including the club Perfection.  In order to monitor and maintain control over Perfection, Trucchio installed Colon as  the purported head of "security" at the club. In that capacity, Colon provided Trucchio and the Gambino Family with a physical presence at Perfection, and Colon monitored and collected extortionate payments from the club.  On July 12, 2009, a group of patrons at Perfection got into a fight with Colon and several bouncers who

2

worked under him.  During this initial fight, one of the patrons punched Colon in the face and

knocked him down.  The fact that Colon had been hit and knocked down, on the Gambino

Family's own turf, could not be tolerated.  The group of patrons was quickly ejected from the

club by a group of bouncers.  Several minutes later, however, one of the patrons, a young man

named David Claudio, was several blocks away from the club when a group of bouncers

approached him.  The bouncers grabbed Claudio and told him he needed to be brought back to

the club.  Claudio protested, pointing out that he had already left and was several blocks away

from the club; nonetheless, the bouncers insisted that Claudio needed to be brought back.  As

Claudio was being physically dragged back to the club, he saw Colon and a group of others

waiting for him.  At that point, various individuals, including Colon, Trucchio, and various

bouncers punched and kicked Claudio, who was pinned against the hood of a car, and, later,

while Claudio was on the ground.  As a result of the attack, Claudio sustained a broken orbital

socket, a broken jaw, and a broken nose.  Claudio was treated for his injuries in the emergency

room, and doctors have recommended reconstructive surgery for Claudio's face.

   <u>Assault of Timothy Dowd, November 2010</u>.  In approximately 2007, Colon made

an extortionate loan to an individual for approximately $2,000 plus weekly interest.  In the

summer of 2010, Colon told Michael Grillo, who had referred this loanshark customer, that the

loan had not been repaid, and that Colon expected Michael Grillo to make good on the loan.  In

November 2010, Colon went to the home of Gary Grillo – Michael Grillo's father – several days

in a row, looking for Michael Grillo.  Gary Grillo told Colon that Michael Grillo did not live at

the house, and that Colon should stop coming by.  Around the fifth time Colon came to the

house, Colon got into an argument with Gary Grillo.  During the argument, Gary Grillo's

across-the-street neighbor, Timothy Dowd, came over to try to intervene.  At that point, Colon

went to his car, took a baseball bat out of the trunk, and threatened Dowd and Grillo with the bat.

Grillo then went into his own home, and Colon got back into his car.  Dowd walked back across

the street to his own house.  As Dowd walked across the street, Colon revved the car's engine and

accelerated.  Colon then intentionally hit Dowd with the car, sending Dowd airborne.  Colon

sped away from the scene.  As a result of being hit by Colon's car, Dowd – who was then 61

years old – sustained injuries including a broken knee and a broken clavicle.

These violent attacks are only part of Colon's criminal conduct here.  He also has

pled guilty to ecstasy trafficking; multiple extortions of strip clubs in Queens; and illegal

gambling.  Even without the crimes of violence described above, these crimes would make a

significant rap sheet.  Combined with the beatings, stabbing, and other assaults, these crimes

make Colon an exceptionally well-rounded criminal.[2]  Colon has demonstrated clearly that he

poses a tangible threat to the community, and that he is willing to commit acts of extreme

violence to protect his reputation and standing within the mob.

**II.      Colon's Sentencing Arguments**

Colon's sentencing arguments do little to help him.  Colon notes that he is not a

made member of the mafia.  (Def. Memo at 3).  That is true; Colon cannot be made because he is

not of Italian heritage on his father's side.  Nonetheless, Colon has long been an active and

---

[2]      The Government's request for a sentence at the top of the Guidelines range is
further justified because both the ecstasy trafficking, one the assaults, and the illegal gambling
conduct are disregarded in calculating Colon's total offense level under the Guidelines because
they are mroe than eight levels below the lead offense level of 29.  (See Plea Agreement at 4).
Where, as here, an offense is disregarded from the offense level calculation, that discounted
offense "may provide a reason for sentencing at the higher end of the sentencing range for the
applicable offense level."  U.S.S.G. § 3D1.4(c).

trusted Gambino Family associate. Tellingly, on several tapes, crew members discuss the fact

that, if he had a different last name, Colon would have gotten made. Colon himself often made

the same statement to others within the crew. Whatever his formal status, Colon has made clear

by his own conduct, over the course of many years, that he is dedicated and loyal to the Gambino

Family.

Colon states that he has not made as much money as certain co-defendants. (Def.

Memo at 3). It is true that, unlike certain co-defendants, Colon did not make millions, and did

not live a particularly lavish lifestyle. Nonetheless, Colon made enough money from drug

trafficking, extortion and gambling to provide for himself and his family for years, without

working a real job.[3]

Colon points out that this is his first felony conviction, and that he has no history

of recidivism. (Def. Memo at 3). As with certain co-defendants here, this argument is true, but

proves little. We now know that Colon has been committing serious crimes – violent attacks,

drug trafficking, and extortion – with and for the Gambino Family throughout the past 15 years.

He simply hasn't been caught until now.

Colon notes that, unlike "certain co-defendants," he has not engaged in

obstruction of justice. (Def. Memo at 3). That argument means little. Colon is not charged with

obstruction, has not been convicted of obstruction, and nobody argues that he should be punished

for obstruction. The fact that he did not commit a crime for which he has not been charged is

---

[3]     Colon admits that, from 2005 through 2011, he received worker's compensation
"as a result of a permanent partial disability." (Def. Memo at 9). Obvious questions arise about
the legitimacy of any claims Colon made to obtain these benefits: whatever the nature of Colon's
purported disability, he certainly had enough use of his physical faculties to work as a bouncer at
Perfection and to carry out the assaults discussed above.

irrelevant, and does not recommend a lower sentence.

Colon claims that his infant son was in the car at the time he attacked Timothy Dowd in 2010, by hitting Dowd with his car.  (Def. Memo at 6-7).  That fact, if anything, makes Colon's conduct even worse.  To initiate and escalate a fight – including by grabbing a baseball bat out of a car – while an infant is inside that very same car shows a dangerous lack of control. Then, to make matters worse, when Colon intentionally sped up and ran into Dowd with his car, Colon endangered the infant who was a passenger inside the car at the time.

Finally, Colon claims he has not used cocaine, yet, somewhat strangely, states that "participation in the BOP's residential drug treatment program could, however, be beneficial to Mr. Colon's rehabilitation." (Def. Memo at 9).  In fact, Colon did use cocaine, and occasionally sold small quantities, up until the time of his arrest.

For all of these reasons, the Government seeks a sentence of 97 months' imprisonment.

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____/s/_____
Elie Honig / Daniel P. Chung / Natalie Lamarque
Assistant United States Attorneys
(212) 637-2474 / 2417 / 2206



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 9, 2012

By E-mail

Francisco E. Celedonio, Esq.
401 Broadway, Suite 2506
New York, NY 10013
fecdrq@yahoo.com

> Re:   **United States v. Christopher Colon, S2 11 Cr. 12 (RMB)**
> **United States v. Christopher Colon, S1 11 Cr. 614 (VM)**

Dear Mr. Celedonio:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Christopher Colon ("the defendant") to Counts One, Eleven, and Thirteen of Indictment S2 11 Cr. 12 (RMB) (the "11 Cr. 12 Indictment") and Count One of Indictment S1 11 Cr. 614 (VM) (the "11 Cr. 614 Indictment").

Count One of the 11 Cr. 12 Indictment charges the defendant with conspiring to participate in the conduct of a racketeering enterprise, in violation of Title 18, United States Code, Section 1962(d), and carries a maximum term of imprisonment of life imprisonment; a maximum term of life supervised release; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.  The defendant specifically admits to participating in underlying racketeering acts including (1) Ecstasy trafficking; (2) extortionate collection; and (3) operating an illegal gambling business -- sports betting.

Counts Eleven and Thirteen of the 11 Cr. 12 Indictment each charge the defendant with assault in aid of racketeering, in violation of Title 18, United States Code, Sections 1959(a)(3) and 2, and each carry a maximum term of imprisonment of 20 years' imprisonment; a maximum term of three years' supervised release; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

Count One of the 11 Cr. 614 Indictment charges the defendant with conspiring to participate in the conduct of a racketeering enterprise, in violation of Title 18, United States Code, Section

06.06.2011

1962(d), and carries a maximum term of imprisonment of 20 years' imprisonment; a maximum term of three years' supervised release; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment. The defendant specifically admits to participating in underlying racketeering acts including (1) extortion of the Perfection strip club and; (2) extortion of the Rouge strip club.

The total maximum term of imprisonment on all counts is life imprisonment.

In consideration of the defendant's plea to the above offenses, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations as to which this Office cannot, and does not, make any agreement) for the conduct described and charged in the 11 Cr. 12 Indictment and 11 Cr. 614 Indictment, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq*. In addition, at the time of sentencing, the Government will move to dismiss any open Count(s) against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

A.     Offense Level

1.     The Guidelines Manual in effect as of November 1, 2011, applies in this case.

**11 Cr. 12 Indictment**

2.     Pursuant to U.S.S.G. § 2E1.1, the offense level for racketeering offenses is the greater of (i) 19, or (ii) the offense level applicable to the underlying racketeering activities. As set forth below, the offense level applicable to the underlying racketeering activities in this case is greater than 19.

Group A: Ecstasy (MDMA) Trafficking

3.     The drug quantity is 100 grams of MDMA. Pursuant to the drug equivalency table at U.S.S.G. § 2D.1.1 Application Note 10(D), 100 grams of MDMA equates to 50,000 grams of marijuana. Accordingly, the total amount of drugs is equivalent to 50 kilograms of marijuana, which results in a base offense level of 20, pursuant to U.S.S.G. § 2D1.1(c)(10).

Group B: Extortionate Collection

4.      Pursuant to U.S.S.G. § 2E2.1, the base offense level for this conduct is 20.

5.      Because the offense involved the use of a dangerous weapon, 4 offense levels are added, pursuant to U.S.S.G. § 2E2.1(b)(1)(B).

6.      Because the victim of the offense sustained a degree of injury between serious bodily injury and permanent or life-threatening bodily injury, 5 offense levels are added, pursuant to U.S.S.G. §§ 2E2.1(b)(2)(E).

7.      Thus, the total offense level, with the applicable enhancements, is 29.

Group C: Operating an Illegal Gambling Business – Sports betting

8.      Pursuant to U.S.S.G. § 2E3.1(a)(1)(A), the base offense level is 12.

Group D: Assault in Aid of Racketeering (Count Eleven)

9.      Pursuant to U.S.S.G. §§ 2E1.3(a)(2) and 2A.2.2, the base offense level for this conduct is 14.

10.     Because the offense involved the use of a dangerous weapon, 4 offense levels are added, pursuant to U.S.S.G. § 2A2.2(b)(2)(B).

11.     Because the victim of the offense sustained serious bodily injury, the offense level is increased by 5 levels pursuant to U.S.S.G. § 2A2.2(b)(3)(B).

12.     Thus, the total offense level, with the applicable enhancements, is 23.

Group E: Assault in Aid of Racketeering (Count Thirteen)

13.     Pursuant to U.S.S.G. §§ 2E1.3(a)(2) and 2A.2.2, the base offense level for this conduct is 14.

14.     Because the victim of the offense sustained serious bodily injury, the offense level is increased by 5 levels pursuant to U.S.S.G. § 2A2.2(b)(3)(B).

15.     Thus, the total offense level, with the applicable enhancements, is 19.

Grouping Analysis for 11 Cr. 12 Indictment

16.   The following chart sets forth the applicable grouping analysis pursuant to U.S.S.G. § 3D1.4(a):

| Group | Offense Level | Units |
|-------|---------------|-------|
| A | 20 | 0 |
| B | 29 | 1 |
| C | 12 | 0 |
| D | 23 | .5 |
| E | 19 | 0 |

17.   Because there are a total of 1.5 units, the offense level after the grouping analysis is 30.

## 11 Cr. 614 Indictment

18.   Pursuant to U.S.S.G. § 2E1.1, the offense level for racketeering offenses is the greater of (i) 19, or (ii) the offense level applicable to the underlying racketeering activities. As set forth below, the offense level applicable to the underlying racketeering activities in this case is greater than 19.

Group A: Extortion of Perfection

19.   Pursuant to U.S.S.G. § 2B3.2(a), the base offense level for this conduct is 18.

20.   Because the extortionate conduct involved an express or implied threat of bodily injury, 2 additional points are added, pursuant to U.S.S.G. § 2B3.2(b)(1).

21.   Because the amount demanded or the loss to the victim exceeded $10,000, but was less than $50,000, 1 additional point is added, pursuant to U.S.S.G. §§ 2B3.2(b)(2) and 2B3.1(b)(7)(B).

22.   Thus, the total offense level, with the applicable enhancements, is 21.

Group B: Extortion of Rouge

23.   Pursuant to U.S.S.G. § 2B3.2(a), the base offense level for this conduct is 18.

24.   Because the extortionate conduct involved an express or implied threat of bodily injury, 2 additional points are added, pursuant to U.S.S.G. § 2B3.2(b)(1).

25.   Because the amount demanded or the loss to the victim exceeded $10,000, but was less than $50,000, 1 additional point is added, pursuant to U.S.S.G. §§ 2B3.2(b)(2) and 2B3.1(b)(7)(B).

26.   Thus, the total offense level, with the applicable enhancements, is 21.

Grouping Analysis for 11 Cr. 614 Indictment

27.   The following chart sets forth the applicable grouping analysis for Count One pursuant to U.S.S.G. § 3D1.4(a):

| Group | Offense Level | Units |
|-------|---------------|-------|
| A     | 20            | 1     |
| B     | 20            | 1     |

28.   Because there are a total of 2 units, the offense level after the grouping analysis is 23.

Grouping Analysis for All Charges

29.   The following chart sets forth the applicable grouping analysis for all charges pursuant to U.S.S.G. § 3D1.4(a):

| Group                 | Offense Level | Units |
|-----------------------|---------------|-------|
| 11 Cr. 12 Indictment  | 30            | 1     |
| 11 Cr. 614 Indictment | 23            | .5    |

30.   Because there are a total of 1.5 units, the offense level after the grouping analysis is 31.

31.   Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant accepts responsibility as described in the previous sentence, an additional 1-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b) because the defendant will have given timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.